1  MUHAMMAD KHAN

2  CTF BF7156

3  PO Box 689

4  Soledad, CA

5  93960

FILED

JAN 27 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

6

7  Pro Se Plaintiff

8

9  United States District Court

10  NORTHERN DISTRICT OF CALIFORNIA

11

12  MUHAMMAD KHAN,                    |        Case: 18 CV 07490 BLF

13        plaintiff,                  |

14  V.                                |        Plaintiff MUHAMMAD KHAN's 2nd

15  SAP LABS, LLC;                    |        AMENDED COMPLAINT for DAMAGES

16  DOES 1-30;                        |        (post 12b6 ruling w/ leave)

17        defendants.                 |        for:

18                                    |

19  _____       |        (1) VIOLATION OF LABOR CODE

20                                             § 1102.5;

21                                             (2) COMMON LAW INVASION OF

22                                             PRIVACY;

23                                             (3) VIOLATION OF CALIFORNIA

24                                             CONSTITUTION, ART 1 §1,

25                                             RIGHT TO PRIVACY;

26

27

28                                             DEMAND FOR JURY TRIAL.

i

<u>LIST OF EXHIBITS</u>

1.  Texts between KHAN and "Akhila"   DECEMBER OR JANUARY 2016

2.  TWILIO Documents

3.  SHIROLE's Citizenship letter

4.  Email to SAP CEO about treatment, HR

5.  Performance Review of KHAN

6.  Promotion and Raise of KHAN

7.  AETNA/HR Medical leave emails

8.  SAP Flyer/Poster of KHAN

9.  Le's emails "left on [his] own", Law Firm

10.  Court transcript of Records, Greere Reviews

11.  Emails between NBO/Nolo and DA

12.  Missing emails, Facebook password requests

13.  Smith advice filing later

14.  DFEH filings, email to ISENBURG, Amended Complaint

Plaintiff, Muhammad Khan, alleges, on basis of personal knowledge and/or information and belief:

## I. SUMMARY

This is an action by plaintiff, MUHAMMAD KHAN ("Khan" or "Plaintiff"), whose employment with defendant SAP Labs, LLC ("SAP") was wrongfully terminated under the doctrines of Constructive Discharge and/or mixed-motive. Plaintiff brings this action against defendants for economic, non-economic, compensatory, and punitive damages, pursuant to civil code §3294, pre-judgement interest pursuant to CCP §3291, and costs and reasonable attorneys' (future) fees pursuant to Gov. Code section 12965(b) and CCP §1021.5.

## II. PARTIES

1. Plaintiff: Plaintiff KHAN was, and at all times mentioned in this Complaint, a resident of the County of Santa Clara, California.

2. Defendants: Defendant SAP is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and and authorized and qualified to do business in the County of Santa Clara. Defendant's place of business, where the following causes of action took place, was and is in the County of Santa Clara, at 3410 Hillview Ave., Palo Alto, CA 94304.

3. DOE Defendants: Defendants DOES 1 to 30, inclusive, are sued under fictitious names pursuant to CCP §474. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, supervisor, servant, partner, and/or employee of the co-defendants, and in taking the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and employee, with the permission and consent of the co-

1

1  defendants. The named defendant and DOE defendants are sometimes hereafter

2  referred to collectively and/or individually, as "defendants."

3      4. Relationship of defendants: All defendants compelled, coerced, aided,

4  and/or abetted the discrimination, retaliation, and harassment alleged in this

5  Complaint, which conduct is prohibited under Cal. Gov. Code §12940(i). All

6  defendants were responsible for the events and damages alleged herein, in-

7  cluding on the following bases:

8          (a) defendants committed the acts alleged;

9          (b) at all relevant times, one or more of the defendants was the

10             agent or employee, and/or acted under the control or supervision

11             of one or more of the remaining defendants and, in committing

12             the acts alleged, acted within the course and scope of such

13             agency and employment and/or is or are otherwise liable for

14             plaintiff's damages;

15         (c) at all relevant times, there existed a unity of ownership and

16             interest between or among two or more of the defendants such

17             that any individuality and separateness between or among those

18             defendants has ceased, and defendants are the alter egos of one

19             another. Defendants exercised domination and control over one

20             another to such an extent that any individuality or separateness

21             of defendants does not, and at all times herein mentioned did

22             not, exist. Adherence to the fiction of the separate existence

23             of defendants would permit abuse of the corporate privilege and

24             would sanction fraud and promote injustice. All actions of all

25             defendants were taken by employees, supervisors, executives,

26             officers, and directors during employment with all defendants,

27             were taken on behalf of all defendants, and were engaged in,

28             authorized, ratified, and approved of by all other defendants.

5. Defendant SAP directly employed plaintiff KHAN, as defined in the Fair Employment and Housing Act ("FEHA") at Goverment Code section 12926(d).

6. Defendant SAP compelled, coerced, aided and abetted the discrimination, which is prohibited under Cal. Gov. Code §12940(i).

7. Defendants retaliated against KHAN for reporting, providing information, exercising his rights, and/or notifying his employer, or any person acting on behalf of the employer of any violation or noncompliance which is prohibited under Cal. Labor Code §1102.5.

8. Defendants violated Plaintiff's privacy and his right to privacy which is prohibited under Cal. Constitution, Art 1 §1, and Common Law.

9. Finally, at all relevant times mentioned herein, all defendants acted as agents of all other defendants in committing the acts alleged herein.

### III. FACTS COMMON TO ALL CAUSES OF ACTION

10. Plaintiff's hiring: KHAN is a 30-year-old, Pakistani-American, Straight, Male, who began working as an intern, and later, progressing, a manager at SAP.

11. Plaintiff's Job Performance: Khan began his employment at SAP in July of 2013, and throughout his employment performed his duties above expectations, was well liked by others, and excelled in his position.

12. Plaintiff's protected status and activity:

   a. Plaintiff Khan is Pakistani

   b. Plaintiff is straight

   c. Plaintiff is a Muslim

   d. Plaintiff is overweight

   e. Plaintiff was suffering from Depression

   f. Plaintiff complained of unlawful acts by Defendants.

3

13. Defendants adverse employment actions and behavior:

    a. In July,2013, KHAN started an internship with SAP and worked within the Startup Focus team. Within 90 days, Sanjay Shirole was hired as an employee within the same team. ("Shirole").

    b. Although KHAN did not report to SHIROLE, SHIROLE began and consistently tasked KHAN with projects assigned to SHIROLE including but not limited to setting up events, contacting his contacts, performing all logistics for trade show events, scanning his business cards, and researching and putting together materials for his role on the team; among other things. This was in addition to the work KHAN was already doing in his position.

    c. KHAN had reported unlawful behavior prior to his supervisors regarding inappropriate sexual comments. Particularly, to Ron Wessels.

    d. Through December 2013, Shirole used KHAN exclusively among 3-10 interns for his deliverables at SAP. Shirole also asked KHAN to communicate to Shirole via his personal GMAIL email: Sanjay@Shirole.com .

    e. KHAN also worked on another project in the company, "HANA HAUS," a then-projected physical customer space in Palo Alto, California and went to several meetings for that project under Sanjay Rajagopalan, another executive in the company.

    f. SAP bills itself as one of the largest Enterprise software companies in the world. Despite providing products and services to companies of all sizes and purporting to value diversity, SAP has an ongoing practice of discriminating against and harassing its own minority employees, specifically those who are not German or Indian. KHAN was no exception to SAP's discriminatory

practices.

g.  In January of 2014, KHAN was hired into the SALES area of SAP and was assigned to the SAP campus in Palo Alto, CA. Khan was receiving sales training for Enterprise products.

h.  In February and March of 2014, Shirole reached out to KHAN and told him Shirole was put in charge of the Hana Haus project. Shirole urged repeatedly his desire for KHAN to leave sales and come work for him. Shirole disclosed to KHAN that his old manager, Kaustav Mitra, was forcing leadership to hire Mitra's cousin into the role. Shirole told KHAN he would backdoor him into the role. Shirole repeatedly called and had KHAN meet with him during his sales program - requiring KHAN to drive from Dublin to Palo Alto (Ca.), interrupting his training. Shirole also pervasively contacted KHAN to prepare a resume, email a specified HR employee, and ensured KHAN would be the one hired for the position.

i.  Based on information and belief, Shirole is a high-level software executive in his 50s who has previously ran and sold a company. Through manipulative questioning and proding, Shirole knew about KHAN's family, his and their financial status, and KHAN's personal life.

j.  After Khan was fast-tracked into the role, Shirole began offering and giving KHAN rides from work to home and vice versa thus ensuring one-on-one time and and setting up the stage for future inappropriate conversations with KHAN. KHAN thought the actions were strange and inappropriate, but naively assumed Shirole knew better due to his experience and age difference.

k.  KHAN began officially working for SHIROLE directly in or around April of 2014. This is when Shirole became more abusive towards

KHAN through comments and actions. Shortly after moving to the DEER CREEK campus of PALO ALTO, Shirole separated Khan and his workspace and desks from the tools team isolating them in an inner cubby area away from sight and earshot of other employees.

l. Shirole would constantly want to know where KHAN was on non-working hours. When Khan attempted to take "Bhangra" classes (a form of asian dance) in San Francisco, during evening hours, Shirole berated him to not do anything else but work Monday to Friday.

m. Shirole constantly told KHAN he was overweight and told him multiple times, "you need to lose weight." This occurred in or around May 2014 throughout his initial conversation with HR. Shirole would, for example, race KHAN up the stairs of his workplace, rushed ahead of him, and then laughed at how slow KHAN was. Another time, they were walking from the DEER CREEK campus to HILLVIEW campus and was panting from the stairs. Shirole looked at Khan and said, "man, look at you; you can't even make it across."

n. Around the summer of 2014, Shirole asked KHAN to meet with him in an adjacent conference room to their cubby space. Shirole wanted to review some of their work but then upon sitting, proceeded to ask KHAN about his sexuality. Specifically, Shirole asked KHAN if he was gay and that he should "seriously consider coming out." KHAN was appalled and shocked by his comment but laughed it off to ease the awkward situation. The sexual harassment occured again when a pot-ential business partner from an east coast University, John Doe, met with both KHAN and Shirole about Hana Haus. The Doe partner spoke about Doe and Doe's husband moving to the Bay Area and, in passing, mentioned that he liked Khan's socks. Upon the Doe visitor leaving, Shirole told KHAN "See, he thinks you're gay too, repeating the har-

assment. In a later time, Shirole told KHAN about an executive, who at the time worked with Jonathan Becker, both marketing executives, Doe 2 (caucasian male), who had "come out" later in life and how it affected the Doe 2's marriage with a woman. Shirole mentioned that they'd been at the same sports meet, swimming, and he spoke to the Doe 2 about it there.

o. Shirole made degrading comments to other SAP employees about Khan, that "I ride KHAN like a tiger." Khan overheard this on Shirole's conversation with an executive, male indian who Kaustav Mitra reported to, Doe 3, when he came to visit the cubby. KHAN approached Shirole about this and Shirole brushed it off saying, "this isn't my first rodeo."

p. When a third coworker, Param Bedi "Bedi," joined the Hana Haus team, Shirole would have the same "...ride Khan like a tiger" conversation with Bedi.

q. Shirole told KHAN to prepare name tags for the cubby space for desk identification; large enough to see and to post them next to the 3 employees. After KHAN had prepared them, SHIROLE ripped them off the wall angrily, a few days later, with no apparent reason nor explanation.

r. Around this time, Shirole started using the words "Choot" and "Chootya", meaning "f@#king fool" in hindi. Shirole would call Khan and other employees he disliked, e.g. Mitra, this.

s. Two interns joined the Hana Haus team on or around June of 2014 - "Josefin" and "Akhila." Both are females who at the time were in or finishing college. Around the end of their internship, they both told KHAN how Shirole made them both feel uncomfortable and how he harassed them both in a conference room. Akhila also texted this to

KHAN (exhibit 1) in January of 2016 corroborating the harassment.

t. During separate instances, Shirole made comments and acted intentionally to spite/ruin the interns as well. Akhila wanted to meet one of the executives/leaders of SAP during a meeting. Shirole told KHAN "Why would I introduce that women to Hasso." When Josefin wanted to join the Operations team, Shirole intentionally went to one of the senior members (Sven or the likely named) and intentionally told them negative things about Josefin in order for them to hire her. She was a great intern but Shirole told Khan after his meeting with "Sven" that Shirole did not want her "above" him meaning the Hana Haus team was under the operations team, supra. Shirole also made negative comments and complained about various women in the company, e.g. how some indian women wore traditional garb to work.

u. Mele Lynch "Lynch," was the project manager on Hana Haus. Lynch often spoke to Khan about Shirole's behavior. Particularly, Lynch asked KHAN "Does Sanjay hate women?" This affirmed Khan's beliefs that Shirole may harass KHAN due to his effeminate/femine qualities such as being soft-spoken, dressing well, and/or having high emotional intelligence. In point of fact, Lynch, a senior and seasoned project manager, asked KHAN about this issue.

v. When Carly Cooper, another employee of SAP who was part of the initial Hana Haus planning team expressed and applied for the Hana Haus team, Shirole communicated to KHAN, "I'd never hire that women!"

w. In or around September of 2014, KHAN realized that Shirole created a hostile work environment and KHAN needed to get out from under him.

x. KHAN interviewed and received an offer from TWILIO (exhibit 2). When KHAN told Shirole about this, Shirole became visibly upset and told KHAN he shouldn't leave. He said that the project wasn't complete and

1    that the "[leadership] was watching him." Moreover, Shirole told KHAN

2    he "would not help [KHAN] with his citizenship." KHAN later accepted

3    offer as indicated by a W2 request from TWILIO, but did not immediately

4    tell Shirole of this fearing losing his citizenship.

5    y. In or around October of 2014, Shirole wrote a letter for KHAN for his

6    citizenship (exhibit 3 )

7    z. While working for Shirole and during work hours, Shirole had KHAN

8    research car engine/parts for him because something was wrong with one

9    of his cars. KHAN emailed several to Sanjay@Shirole.com.

10   When Shirole bought a new car, Shirole drove KHAN to pick up the new

11   one in the east bay and KHAN drove Shirole's car back to SAP campus.

12   Around the same time, Shirole sold KHAN Shirole's 1999 Honda Civic.

13   This was not the car KHAN did research for as that car, SUPRA, was some

14   sort of SUV.

15   aa..In or around December of 2014, KHAN brought a male friend, straight,

16   40s, who worked for HP, to SAP's Holiday party as a plus 1. The next

17   . work day, Shirole told KHAN "Dwayne and I were talking about how

18   you're gay" referencing how KHAN brought a male to the Holiday party.

19   ab. In or around January of 2015, KHAN moved from Palo Alto to San Fran-

20   cisco to work for the company TWILIO. KHAN communicated to Shirole over

21   phone that he was doing so and Shirole became upset, demanding KHAN

22   not leave, move back to Palo Alto, and finish the Hana Haus project.

23   Additionally, Shirole told KHAN that KHAN leaving "wouldn't be good

24   for you" and "affect your citizenship." KHAN became scared and did not

25   show up to his scheduled start date at TWILIO. Additionally, KHAN began

26   looking for places in PALO ALTO and moved to a hostel-style apartment

27   with multiple beds temporarily during his search. Khan then juggled 2

28   separate "rents" as he was in a contract with the SF Apartment complex

9

and couldn't get out. Moreover, KHAN was helping his family with finances causing an additional burden on him.

ac. In or around February or March of 2015, Shirole, Bedi, and KHAN were set to open the Hana Haus retail space on University Ave. in Palo Alto. During one of set-up days, KHAN and Bedi were setting up poster boards in the courtyard. KHAN received a call from their partner Blue Bottle coffee ("BB") and picked up his phone. During Khan's conversation, Bedi pushed KHAN, causing him to fall - a physical assault. Khan reported this to Shirole via email and in person. Yet, Shirole did not make a report of it to proper personnel within SAP. Rather, he brushed it off and covered up the incident.

ad. Around the same time, KHAN received a call from an HR rep that asked if he, at the time, wanted to report anything or discuss any incident. The representative, did not specify an incident nor cause of the call but was generically asking. Fearing retaliation from Shirole and wanting to get his thoughts together before going back to HR, did not. KHAN told Shirole about the call right afterwards and asked if he had reported the Bedi incident, to which Shirole said no. In lieu, Shirole said that no one contacted him (at that time, unknown if HR did later) and that Shirole was careful because he was rel-atively new to the company and if KHAN said anything about him, Shirole would "f@ck [Khan] over." Shirole further told Khan that he should "be careful" and that "I'm the only one protecting you."

14. In or around February of 2015, Khan received a stellar performance review (exhibit 5).

15. In or around April 2015, Khan received a 13.47% raise and a promotion (exhibit 6).

16. Upon Shirole's demand, Khan moved from San Francisco to Palo Alto going

to a hostel named "inn-cubator" and then subsequent housing to accommodate

Shirole. KHAN requested reimbursement from SAP for his moving expenses.

17. In or around April of 2015, Shirole had Khan give him a ride to SAP campus. Khan picked Shirole up who upon entering, looked around and chastised Khan for having stuff inide his car saying "you're f@cked." Due to the moves, Khan still had items in his car. Around the same time, Khan and Shirole were attempting to fix the wifi in Hana Haus when KHAN suggested to re-cycle the power. Shirole immediately called him a "chootya," i.e. a f@cking fool.

18. Due to Shirole's constant and imposing harassment, Khan reached out to HR and other managers in the company. Particularly, Khan reached out to:

   a. After an HR report, an Indian male, under HR lead Jewell Parkinson, emailed and then spoke to KHAN over phone. Khan explained to him Shirole's constant harassment of his weight, sexuality, inappro-priate comments, Bedi's assault, and the TWILIO incident, among the other concerns he was having with Shirole. KHAN told this Indian HR liaison to keep the matters as private as possible and to prevent Shirole from further harassing KHAN.

   b. Manager "Priya" who was Shirole's supervisor about the harassment and concerns Khan had. Khan asked to be moved to another team.

   c. Managers Ben Boeser and Denis Browne about Khan's concerns who in-itially guided KHAN to go speak to HR.

   d. Startup Focus Manager "Manjay" who advised KHAN that "Sanjay shouldn't treat you like that...he's wrong."

   e. Manager Ann Rosenburg who offered KHAN a fellowship on her team. This fellowship consisted of KHAN working in Washington D.C. helping build relations with public organizations of color, e.g. the Con-gressional Black Caucus. Rosenburg spoke to KHAN about this at a

local, Palo Alto, coffee shop. After Rosenburg spoke to Shirole, she subsequently informed KHAN that Shirole wouldn't allow it.

19. Shortly after Khan's conversation with HR (Indian, possibly "Prasad"), and with Priya, Shirole harassed KHAN saying "you went above me." This instances was the same as Shirole not wanting Josefin "above him" because the operations team was structurally above the Hana Haus team. KHAN thought Shirole might have strong belief in the caste system prominent in India.

20. After Khan's conversation with Rosenburg, Shirole told Khan in person at Hana Haus that Shirole would not allow KHAN to move to another team and that Khan "should work under [Shirole] or quit."

21. Shirole retaliated against KHAN by stopping him from attending meetings, travel anywhere for client meetings, denying training, denying opportunities (fellowship/growth), and filing malicious reports to HR against KHAN. KHAN saw a sudden change in his reviews and opportunities.

22. Shirole retaliated against KHAN by placing an "expectations" memo in his personnel file alleging false claims. Shirole suddenly alleged that KHAN was not performing well even though he had never received any such notice in his almost two years at the time with SAP. Moreover, this was a drastic, and sudden change from his stellar performance review, promotion, and raise which were prompted by Shirole. Shirole contd reporting KHAN to HR throughout his time with SAP, stopped him from working remotely or from home, and continually pestered KHAN about whom he spoke to at work. This was in addition to his other harassment.

23. Consequently, due to severe harassment and stress from Shirole, KHAN became depressed. KHAN communicated this to SAP HR and AETNA and attempted to take FMLA leave. He was denied leave several times. KHAN emailed AETNA/HR about his condition and leave (exhibit 7).

12

24. Even though KHAN was approved for FMLA later, due to a delay in records being submitted not in control of KHAN, Defendants invalidated and removed all of his accrued vacation, sick days, and PTO. This was retaliation of disability and exercise of wanting to take a medical leave.

25. KHAN brought his concerns to the attention of HR properly. After (exhib 4) emailing the CEO of SAP, Bill McDermitt, KHAN was contacted by Jewell Parkinson, the head of HR, North America. Parkinson agreed to move KHAN to a different team after KHAN informed Parkinson of the harassment and unbearable hostile workplace created by Shirole. KHAN emailed Parkinson with a throughly written formal complaint (within email records but now unavailable to Plaintiff without discovery). The complaint detailed Shirole's behavior and harassment based on protected traits and inappro-priate actions by Shirole: e.g. This complaint and verbal conversations with HR reps included Shirole's comment to KHAN stating he wanted to have a "white person...be the face of Hana Haus."

26. In retaliation for filing a complaint based on protected traits and continued workplace bullying, hostile work environment, KHAN was con- by HR representative Jenny Le, and placed on unpaid leave, indefinitely, while being told not to go to SAP campus and not to contact any SAP employee. Le spent several months interrogating KHAN & demanding whatever information Le could glean from KHAN. At one point, due to not being paid and needing funds, the fear of further retaliation from Shirole, and stress from having to recall all of Shirole's abuse, KHAN asked if he could stop and go back to work. Le told KHAN no, and stated he had to keep telling her about the complaint and participate; continue the process.

27. KHAN sent emails to Le as well about his Depression and emailed where to register a disability. Le never responded nor addressed those matters; failed to accomodate KHAN.

13

28. As continued retaliation, Defendants and Shirole hired a "white person" to replace KHAN's position/role. This was consistent with SHIROLE's threat and action violating his protected class of Race/Skin Color. Moreover, the hiring was nepotistic as Daniel Zimmerman, the hire, is the husband of an employee in Startup Focus; the practice is infamous in SAP. KHAN found out about the hiring via an email. Not only did Defendants retaliate against KHAN for filing a complaint by forcing him on indefinite leave, without pay, his position was replaced setting the precedent for the termination, constructive or otherwise. KHAN complained about this to LE prior to termination.

29. If KHAN was not placed on unpaid leave as a result of filing his complaint and discussing the discrimination, harassment, and hostile work environment created by Defendants and Shirole, he would never have had his position replaced. Moreover, Zimmerman, a German, fit the criteria of a "white person" and a German, per origin of SAP, a German Company. Zimmerman took over the majority, if not all, the responsibilities that KHAN held in the role.

30. Around the summer of 2015, emails between KHAN and Shirole started disappearing. Shirole had direct access to the networks within Hana Haus and had knowledge of his email information as SHIROLE had knowledge and had requested information regarding KHAN's email accounts.

31. KHAN was recruited for an SAP flyer/poster, marketing tools, independant of his supervisor's input, showing that his satisfactory or better performance was recognized by other employees. (exhibit 8 ).

32. KHAN engaged in protected activity by opposing unlawful employment practices. KHAN's complaints throughout the latter part of his employment were protected under Cal. Gov't Code §12940, et seq.

33. Shirole and Defendants independently and/or together took advantage of

14

1　　their positions of power over KHAN, and took advantage of him, attemp-

2　　ted and did control every aspect of his life, and consistently

3　　harassed him about his appearance, race, perceived sexuality, disabil-

4　　ity, and other issues Shirole and/or Defendants had with KHAN. KHAN

5　　continued to fear retaliation for complaining about Shirole's harass-

6　　ment and bullying. And indeed, he was retaliated by Shirole and

7　　Defendants.

8　　34. Defendants' constructive termination of plaintiff's employment:

9　　　　a. On December 1, 2015, not able to stand another day of working w/

10　　　Shirole and Defendants, KHAN emailed relevant HR parties and co-

11　　　workers. In his email, KHAN explained to the recepients that he

12　　　felt compelled to leave because of ongoing harassment and discrim-

13　　　ination by Shirole and Defendants. That his prior complaints

14　　　made to HR had gone nowhere. KHAN further stated the protected

15　　　criteria he fell under and the workplace harassment he faced.

16　　　b. Within the same timeframe, Le contacted KHAN about his termin-

17　　　ation of employment with Defendants.

18　　　c. When KHAN questioned Le's email, Le responded to KHAN twice

19　　　stating KHAN had "left on[his] own" and voluntarily left.

20　　　(exhibit 9).

21　　　d. KHAN emailed Parkinson about the concerns and was responded to by

22　　　a law firm that insisted KHAN was "voluntarily leaving[his]

23　　　employment with SAP..." and that he should find other employ-

24　　　ment (exhibit 9).

25　　　e. KHAN documented how other employees had complained about Shir-

26　　　ole's behavior, e.g. Front Desk Rep "Jessica" about Shirole mak-

27　　　ing her feel uncomfortable when he spoke to her.

28　　35. Defendants did nothing to protect KHAN nor prevent the harassment and

discrimination. Defendants failed to prevent the workplace bullying or the hostile work environment.

36. Here, KHAN complained extensively and exhaustively. As a result, KHAN was denied further training/education, opportunities, wages, fellow-ship, and was terminated, constructive or otherwise.

37. Defendants' actions were related to his complaints as the unlawful actions taken were proximal in time and done after KHAN complained to respective parties.

38. As further retaliation, Defendants and Shirole told patrons of Hana Haus familiar with KHAN and those coworkers, partners, and customers of SAP/Hana Haus that KHAN was taking sick leave and later, fired. Defendants and Shirole's comments and actions caused KHAN to lose out further jobs and opportunities and as they "salted" the water prevent-ing KHAN from finding employment. E.g. In or around December of 2015, after the constructive termination from Defendants. KHAN was going through the interview process at Github. KHAN did not get the role even after he completed several interview stages with high interest. Conversation fell cold immediately and when KHAN asked Github, a hiring rep told KHAN that someone from SAP had reached out and told them KHAN was terminated and made negative comments about KHAN.

39. Defendants continued retaliation and malicious actions:

    a. In January of 2016, KHAN was arrested for PC §451, unrelated to Defendants. KHAN could not afford bail and was in custody until August 2016. KHAN, coming out, did not have housing, work, nor any basic necessities. KHAN did not have a computer nor access his digital files.

    b. In July of 2016, KHAN learned that Defendants hired law firm "NBO" in Palo Alto, CA, to assist the District Attorney in pro-

secuting KHAN who had     learned this during the preliminary

hearing where Thomas Nolan, attorney w/ NBO, stated "I represent

SAP..."

c. Thomas NOLAN had been present at every hearing of KHAN's yet it ~~was not known for what purpose he was there until both him and~~ his counsel heard from Nolan at the preliminary.

d. District Attorney Anne Seary had requested KHAN's medical records prior to his preliminary for a plea bargain. Due to KHAN's depression and several pain/nerve medications post-surgery, he would receive 1 year probation.

e. Upon counsel Nafiz Ahmed providing records to Seary via email - addressed to Seary only with notice that the records are only for plea-bargaining and if the plea does not occur, to not open the records (email available via counsel but not to Plaintiff at the moment)- Seary backed out of the plea.

f. In January of 2018, post trial, KHAN learned that NOLAN had acquired his medical records from SEARY without any author-ization from Ahmed nor KHAN. Moreover, Nolan had not requested any records officially.

g. Per Cal. Civil Code §56, et seq. Recepients of medical records must receive consent and signed authorization again to further disclose records. No such further authorization was given by KHAN.

h. Court records received by KHAN in or around September 2018 showed the name of the Dr. receiving records and confirmation that actual medical records were disclosed. (exhibit lo).

i. Thomas Nolan was hired by SAP and acted as an agent/partner to prosecute KHAN. Nolan acquired KHAN's records from Seary illeg-aly and without authorization, accessed, reviewed, and disclosed

17

KHAN's Personal/Private Health Information "PHI" which consisted of KHAN's medical information, ailments, treatment, dates, providers, prescriptions, attending staff, etc.

j. Whereas a criminal defendant does not have a general right to privacy, medical records falling within the definitions of CMIA, Civ Code §56, et seq., and Federal HIPAA have several protections of privacy and authorizatoins in place for proper access and disclosures.

k. Further, Defendants took his records, which were acquired illegally, and provided them to a "Dr. Greene." Secretly and without notice to Counsel Ahmed nor KHAN, defendants solicited a report from "Dr. Greene" "[indicating] Khan was a danger and should not be let out of custody..." Dr. Greene indicated that he had reviewed KHAN's medical records as indicated by the honorable Vincent Chiarello via court transcripts. These actions violated KHAN's rights to privacy.

l. Defendants actions occurred outside the scope of employment. KHAN was no longer an employee of Defendants nor under any employment-employee contract at the time of their actions.

m. KHAN learned in or around the time of his trial, KHAN received copies of emails from defense counsel Charles Smith that showed communication between Defendants and Prosecution. Particularly, Defendants through NBO established they had been communicating and providing information/documents, through NBO, to DA Seary and trial DA Charles Wong. (exhibit ‖).

n. Defendants were aware of an impending employment lawsuit from KHAN and made every effort to violate his privacy, facilitate prosecution, curtail court processes, and/or provide perjured

testimony in order to ensure KHAN's conviction.

    o. Based on information and belief from Counsel Smith, Shirole had worked for Google and not SAP through KHAN's proceedings. Defendants were not a party to, were not a witness to, nor had any impact from KHAN's conviction EXCEPT for the delay and prevention of KHAN's employment related lawsuit against Defendants.

        i. Indeed, Defendants influenced KHAN's bail (4x the CA schedule) preventing KHAN from filing his DFEH charge

        ii. Defendants provided documents/files to Palo Alto District Attorneys through a "back door" process outside court-approved rules and procedures.

        ii. Defendants acquired KHAN's medical records and used them to further deny KHAN from leaving custody and provide misleading information to Court officials via unsolicited and unauthorized parties.

        iii. Moreover, Defendants hid their actions and acted maliciously with intent and knowlege of actions.

    p. The actions of Defendants occurred before KHAN's sentencing. For sentencing, post-trial, Counsel Smith requested an evaluation from an actual, authorized, court-appointed Psychologist. This occurred in 2018 and records were acquired by KHAN and given to this new Dr. by KHAN. This is a difference and separate scenario as KHAN authorized the release and a report depicting KHAN's medical condition at the time was officially submitted to the court.

    q. Conversely to Defendants malicious and wanton disregard for the truth, KHAN was attending Graduate school in D.C., working at the Embassy of Pakistan, and volunteering in his community ante-trial.

19.

r. Defendants not only violated KHAN's rights to privacy, they hid evidence showing KHAN's complaints to HR, and his constructive termination aiming rather to depict KHAN as someone who was fired.

40. Shirole had provided a letter for KHAN's citizenship. This corroborates the employment review that exudes the postive traits of KHAN. (exhibit 3).

41. In or around September 2015, KHAN reached out to Google about missing emails (exhibit 12). He also notified Le of multiple requests for new passwords for his facebook account (same exhibit).

42. Upon bailing out of county custody, KHAN followed the advice of Counsel Smith to file with the DFEH right before the 1 year time post-termination (exhibit 13).

43. KHAN filed with the DFEH on November 29, 2016 and received confirmation #837814-264424. KHAN requested an investigation. (exhibit 14)

44. The CA DFEH investigated his claim and stated that any delay was "no fault of the [claimant]." Khan received a Right to Sue notice in July 2017. (exhibit 14).

45. Khan amended his complaint with DFEH to ensure RACE was mentioned. KHAN received an email to sign the amended complaint but was remanded into custody. KHAN was not able to sign the new complaint as he no longer had access to internet nor his computer. Moreover, he had given the DFEH permission to email/contact his sister to finalize the amendment but the DFEH did not send the DocuSign to KHAN's sister. (exhibit 14).

46. Upon sentencing and remand to CDCR custody, KHAN had no access to internet, phone, documents, nor law library per CCR Title 15. Moreover, upon arrival to his current facility, he was not processed and pro-

vided nor allotted privileges until August 2018. KHAN filed his initial claim with Santa Clara Superior Court and upon instatement of privileges, filed suit.

47. Economic Damages: As a consequence of defendants' conduct, plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damages to his career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which those wages should have been paid, in a sum to be proven at trial.

48. Non-economic damages: As a consequence of defendants' conduct, plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

49. Punitive damages: Defendants' conduct constitutes oppression, fraud, and/or malice under Cal Civ. Code §3294 and, thus, entitles plaintiff to an award of exemplary and/or punitive damages.

50. Malice: Defendants' conduct was commited with malice within the meaning of Cal. Civ. Code §3294, including that

    a) defendants acted with intent to cause injury to plaintiff and/or acted with reckless disregard for plaintiff's injury, including by terminating plaintiff's employment and/or taking other adverse job actions against plaintiff because of his race, national origin, color, sexual orientation, religion, disability, and/or good faith complaints, and/or

    b) defendants' conduct was despicable and commited in willful and conscious disregard of plaintiff's rights, health, and safety, including plaintiff's right to be free of discrim-

ination, harassment, retaliation, and wrongful employment

termination.

51. Oppresion: In addition, and/or alternatively, defendants' conduct was commited with oppression with the meaning of Cal. Civ. Code §3294, including that defendants' actions against plaintiff because of his race, national origin, color, sexual orientation, religion, disability, and/or good faith complaints were "despicable" and subjected plaintiff to cruel and unjust hardship, in knowing disregard of plaintiff's rights to a workplace free of discrimination, harassment, retaliation, and wrongful employment termination.

52. Fraud: In addition, and/or alternatively, defendants' conduct, as alleged, was fraudulent within the meaning of Cal. Civ. Code §3294, including that defendants asserted false (pretextual) grounds for terminating plaintiff's employment and/or other adverse job actions, thereby to cause plaintiff hardship and deprive him legal rights.

53. Attorney(s) fees:  Plaintiff will incur legal expenses, and if/when solicited, attorney(s) fees.

54. Exhaustion of administrative remedies: Prior to filing this action, plaintiff exhausted his administrative remedies by filing an administrative complaint with the DFEH within 1 year of termination and subsequently receiving a DFEH right-to-sue letter. Plaintiff amended the complaint but was remanded to custody and was not able to access his email nor respond to DFEH's DocuSign but made every effort prior and after to continue exhaustion and suit.

22

FIRST CAUSE OF ACTION

(Violations of Labor Code §1102.5, et seq. -- Against
Defendants SAP and Does 1 to 30, Inclusive)

55. The allegations set forth in paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

56. At all relevant times, Labor Code §1102.5 was in effect and was binding on defendants. This statute prohibits defendants from retaliating against any employee, including plaintiff, for raising complaints of illegality.

57. Plaintiff raised complaints of illegality while he worked for defendants, and defendants retaliated against him by harassing KHAN, discriminating against KHAN, and taking adverse employment actions, including employment termination, against him. Of example:

   a) KHAN complained to HR employees "Prasad," Jenny Le, and Jewell Parkinson, and Shirole's supervisor "Priya." All who were employees and/or agents of Defendant SAP Labs, LLC and had authority over KHAN and his employment.

   b) KHAN engaged in protected activity by opposing unlawful employment practices. KHAN complained of harassment, workplace bullying, discrimination, and a hostile work environment. On top of the constant inappropriate comments, Shirole harassed KHAN about his Weight, Perceived Sexuality, Race, Origin, and Skin Color. Defendants also violated KHAN's protected class of Disability within the definitions of Cal. Gov. Code §12940, et seq.

   c) KHAN was subject to adverse employment actions by being denied further work and opportunities, denied pay/wages, replacement of his position, and termination of employment, constructive or

23

1    otherwise.

2        d. A causal link exists between the protected activity and the

3    alleged adverse actions by circumstantial evidence. Particularly

4    KHAN would not have been denied work and pay if he hadn't lodged

5    a complaint to LE and other HR representatives. KHAN was also

6    denied a fellowship and training after complaining to "Prasad"

7    and "Priya." If KHAN had not complained to Le/Parkinson, he

8    would not have been placed on unpaid leave nor have had his pos-

9    ition replaced by Zimmerman. As a direct result of engaging in

10   protected activity by opposing unlawful employment conduct, KHAN

11   was removed from his position among the results mentioned herein.

12   The timeframe of the actions by DEFENDANTS were proximal.

13   58. As a proximate result of defendants' willful, knowing, and intentional

14   violations of Labor Code §1102.5, plaintiff has suffered and continues

15   to suffer humiliating emotional distress, mental and physical pain, and

16   anguish, all to his damage in a sum according to proof.

17   59. As a result of defendants' adverse employment actions against plaintiff

18   plaintiff has suffered general and special damages in sums according to

19   proof.

20   60. Defendants' misconduct was committed intentionally, in a malicious,

21   oppressive, fraudulent manner, entitling plaintiff to punitive damages

22   against defendants.

23

24

25

26

27

28

SECOND CAUSE OF ACTION

(Common Law Invasion of Privacy -- Against

Defendants SAP and Does 1 to 30, Inclusive)

61. Plaintiff incorporates and re-alleges the allegations set forth in paragraphs 1 through 60 herein by reference.

62. Defendants are and were not authorized to access, disclose, transmit, or otherwise allow access to plaintiff's Protected Health Information ("PHI").

63. Defendants are and were not authorized to transmit plaintiff's PHI to unauthorized persons.

64. Defendants accessed KHAN's PHI without authorization and signatures. Defendants further took KHAN's medical records and transmitted them to "Dr. Greene" who reviewed, and returned a report to Defendants. This report was corroborated by Honorable Judge Chiarello via court records and Counsel Charles Smith. Defendants also provided addittional documents and files related to KHAN's employment to Santa Clara County Prosecution Staff without a subpoean or a court order. The intrusion occurred into a private conversation &/or matter.

65. As a result of Defendants conduct, Plaintiff's PHI was disclosed to or allowed to be accessed by unauthorized persons.

66. Defendants' conduct alleged herein was highly offensive and egregious and would be offensive to a reasonable person as well as an egregious breach of the social norm.

   a) Courts and Medical Professionals do not make medical records and PHI available to the public and/or unauthorized parties. Per California Civ Code §56, et seq., CMIA, PHI is kept confidential.

67. Defendants' conduct violated Plaintiff's common law right of privacy.

68. At the time(s) of violation, KHAN was not employed nor contracted

25

with Defendants. No employer-employee relationship existed for the violation to occur. KHAN possessed a legally protected privacy interest.

69. Defendants' conduct directly resulted in substantial damages and irreparable harm to plaintiff.

70. Defendants' conduct was intentional, reckless, and/or negligent.

71. Plaintiff is entitled to damages in an amount to be proven at trial, punitive damages, declaratory relief, and future attorney(s) fees.

72. Plaintiff's damages and irreparable harm are substantial and continuing and will continue unless restrained and/or enjoined.

THIRD CAUSE OF ACTION

(Violation of California Constitution,

Art 1 §1 Right to Privacy --

Against Defendants SAP

and Does 1 to 30, Inclusive)

73. The allegations set forth in paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

74. Defendants are and were not authorized to access, disclose, transmit, or otherwise allow access to plaintiff's PHI.

75. Defendants are and were not authorized to transmit, disclose, or otherwise allow access to plaintiff's PHI to unauthorized persons.

76. As a result of defendants' conduct, plaintiff's PHI was disclosed to or allowed to be accessed by unauthorized persons.

77. Defendants' conduct alleged herein was highly offensive and egregious and would be offensive to a reasonable person as well as an egregious breach of the social norm.

78. Defendants' conduct violated plaintiff's right of privacy as provided him under the California Constitution.

79. Defendants' conduct directly resulted in substantial damages and irreparable harm to plaintiff.

    a) KHAN's PHI and medical records constitute a legally protected privacy interest. PHI per Federal HIPAA and/or California CMIA, Cal. Civ. Code §56, et seq., is not disclosable w/o authorization.

    b) KHAN did not authorize defendants nor their employees, agents, and the like, e.g. NBO/Nolan, to access nor transmit KHAN's legally protected medical information and/or records. The disclosures occurred outside the scope of employment with defendants. KHAN's expectation of privacy was objectively reasonable as no authorization, court order, or a subpoena was issued to authorize such disclosures to defendants and/or further parties (Dr. Greene). Dr. Greene never met Khan, nor interviewed him in the scope of preparing any letter/report that was presented to, based on knowledge and belief during sentencing and from defense counsel Smith, to former honorable judge Aaron Persky and subsequently passed to further court parties.

    c) KHAN's PHI was i) legally protected, ii) KHAN possessed a reasonable expectation of privacy and, iii) conduct was a serious invasion of KHAN's protected privacy interest.

80. Defendants' conduct was intentional, reckless, an/or negligent.

81. Plaintiff is entitled to damages in an amount to be proven at trial, punitive damages, declatory relief, and future attorney(s) fees.

82. Plaintiff's damages and irreparable[2]harm are substantial and continuing and will continue unless restrained and/or enjoined.

---

[2]This is the first footnote: Claimant means irreparable for all "irreparable" in complaint.

27

PRAYER

WHEREFORE, plaintiff, MUHAMMAD KHAN, prays for judgement against defendants as follows:

    a. Appointment of counsel as plaintiff is a lay-person, incarcerated, and unskilled at law.

    b. For general and special damages according to proof;

    c. For exemplary damages, according to proof;

    d. For pre-judgement and post-judgement interest on all damages awarded;

    e. For reasonable future attorney(s) fees;

    f. For costs of suit incurred;

    g. For declaratory relief;

    h. For such other and further relief as the court may deem just and proper.

ADDITIONALLY, plaintiff, MUHAMMAD KHAN, demands trial of this matter by jury. The amount demanded exceeds $25,000 (Cal. Gov. Code §72055).

Dated: January 13, 2020

                           MUHAMMAD KHAN

                           plaintiff, pro per

28

# PROOF OF SERVICE/DECLARATION OF SERVICE
## BY PERSON IN CUSTODY
### (28 U.S.C. § 1746; C.C.P. § 2015.5)

CASE NAME:  Khan v. SAP LABS, et al.

CASE NO.:  18 - CV - 07490 - BLF

I, ___Muhammad Khan_____, declare the following:

I am currently a resident of the California Department of Corrections and Rehabilitation ("CDCR"), located in the county of ___Monterey_____, state of California. I am 18 years of age or older and I'm familiar with the business practices within the CDCR for collecting, inspecting, sealing, and processing correspondence material for mailing with the United States Postal Service. In accordance with that practice, the document(s) and accompanying attachment(s) described below, were placed in the internal mail collection system at the CDCR institution addressed in the proceeding paragraph, and had been deposited with the United States Postal Service in the ordinary course of business. In this manner, the materials are deemed "filed" on the date I turned them over to prison officials. (Houston v. Lack, 487 U.S. 266, 101 L.Ed.2d 245, 108 S.Ct. 2379 (1988).)

On __JANUARY 18__, __2020__, I placed the following:

Second Amended Complaint

in the internal mail collection system at: ___CTF Facility_____, ___Soledad_____ California, for deposit in the U.S. Postal Service in a sealed envelope, postage thereof fully prepaid, and addressed as follows:

US District Court
BLF - Civil Clerk
280 South 1st St
SAN JOSE, CA 95113

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 18 day of JANUARY, 20, at **Soledad** California. **93960**

Signature: _____